# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**HELEN MONTGOMERY,**

**Plaintiff,**

-vs-                                                    **Case No.  6:06-cv-1639-Orl-31KRS**

**FLORIDA FIRST FINANCIAL GROUP, INC.,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion:

| | |
|---|---|
| **MOTION:** | **MOTION FOR JUDGMENT UPON DEFAULT (Doc. No. 55)** |
| **FILED:** | **April 21, 2008** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

## I.    INTRODUCTION.

Plaintiff Helen Montgomery sued defendant Florida First Financial Group, Inc. ("Florida First") for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. ("FDCPA"), and for violations of the Florida Consumer Collections Practices Act, section 559.55, *et. seq.* of the Florida Statutes ("CCPA").  Florida First defended against the action for more than a year until its attorney moved to withdraw and Florida First, through its principal Reed Lienhart, stated it was not opposed to entry of a default for failure to comply with court orders.  Doc. No. 49 at 1.  Default was

entered against Florida First on March 21, 2008. Doc. No. 53. The Doe defendants were dismissed without prejudice on March 22, 2007, for failure to prosecute. Doc. No. 17. Montgomery now moves for entry of default judgment against Florida First.

Montgomery seeks $2,000.00 in statutory damages, $40,000.00 actual damages, $150,000.00 in punitive damages, $62,737.50 in attorney's fees, and $1,303.41 in costs for a total of $256,040.91. Doc. No. 55. Montgomery submits the following in support of her motion:

- Affidavit of Helen Montgomery, doc. no. 55-2 ("Montgomery Aff.");

- Declaration of Counsel, doc. no. 55-3 ("Petersen's Decl.");

- Defendant's collection notes re Montgomery, doc. No. 56-2;

- 2008 For Profit Corporation Report for Florida First, doc. no. 56-3;

- Western Union Customer Receipt, doc. no. 56-4;

- A certified copy of *The Florida Bar v. Florida First Financial Group, Reed Lienhart, et al.*, No. 86,513 (March 20, 1997), doc. no. 56-5;

- Certified copies of consumer complaints to Federal Trade Commission in response to Freedom of Information Act request, doc. no. 56-6;

- Complaint and 3 affidavits filed in *Perry v. Florida First Financial Group*, Eighteenth Judicial Circuit Court of Florida, No. 99-cc-3642-20-R, doc. no. 56-7;

- Statement of Claim in *Ward v. Florida First Financial Group, Inc.*, Circuit Court, Hillsborough County Small Claims Div., No. 00-984OSC, doc. no. 56-8;

- Statement of Claim in *Carrero v. Florida First Financial Group*, Circuit Court, Pasco County Small Claims Div., No. SP2000-1604, doc. no. 56-9;

- Complaint in *Kiewel v. Florida First Financial Group, Inc*, United States District Court for the Middle District of Florida, Case No. 8:04-cv-183-T27, doc. no. 56-10;

- Amended Complaint in *Gray v. Florida First Financial Group, Inc.*, United States District Court for the Middle District of Florida, Case No. 8:04-cv-308-T-24MSS, doc. no. 56-11;

- Judgment in *Gray v. Florida First Financial Group, Inc.*, United States District Court for the Middle District of Florida, Case No. 8:04-cv-308-T-24MSS, doc. no. 56-12;

- Statement of Claim in *Staples v. Florida First Financial Group, Inc.*, Circuit Court, Hillsborough County, No. 04-4542SC, doc. No. 56-13;

- File concerning complaint of Mawana Peterson to the Hillsborough County Consumer Protection Agency (with Affidavit of Kevin Jackson, Records Custodian), doc. no. 56-14;

- Statement of Claim in *Jackson v. Florida First Financial Group, Inc.*, Circuit Court, Hillsborough County, No. 05005143, doc. no. 56-14;

- In the matter of Rosemary Malmstrom's complaint against Florida First Financial Group, Inc. from the Florida Office of Financial Regulation, doc. no. 56-15;

- Complaint in *Field v. Florida First Financial Group, Inc.*, Thirteenth Judicial Circuit Court of Florida, No. 06-cc-9491CC, doc. no. 56-16;

- In the matter of Bruce O'Donnell's complaint against Florida First Financial Group, Inc. from the Florida Office of Financial Regulation, doc. no. 56-17;

- Complaint in *Rodriguez v. Florida First Financial Group, Inc.*, United States District Court for the Middle District of Florida, Case No. 6:06-cv-1678-28-DAB, doc. no. 56-18.

## II.    STATEMENT OF FACTS AND ALLEGATIONS.

Montgomery alleged that Florida First was a debt collector and that she was a consumer within the meaning of FDCPA and CCPA.  Doc. No. 1 ¶ 9, 11.  The complaint alleged that an agent, employee or representative of Florida First[1] telephoned Montgomery's daughter on two separate occasions, identified himself as law enforcement and stated that there was a warrant for her mother's arrest.  *Id*. ¶¶ 15-17.

---

[1] For reasons of simplicity, I refer to this person as Florida First's agent.

An agent of Florida First also telephoned Montgomery's mother and threatened to arrest Montgomery.  *Id*. ¶ 18.[2]  On or about November 8, 2006, Montgomery's mother telephoned Montgomery to inform her about the call and the impending arrest and that she should come home immediately.  *Id*. ¶ 19.  Montgomery, therefore, left work.  *Id*. ¶ 20.  On her way to her mother's house, Montgomery looked for police officers in the neighborhood to see if she was about to be arrested.  Montgomery Aff. ¶ 10.

When Montgomery returned the agent's telephone call that day, she was told directly that they had a signed warrant for her arrest.  *Id*. ¶ 12.  During this telephone call, Montgomery disputed that she owed the debt.  Doc. No. 1 ¶ 22(B).  The agent also claimed that Montgomery owed "late fees and you[r] court costs, late fees and our fees."  *Id*. ¶ 22(C).  When Montgomery disputed that she owed court costs because the matter had not gone to court, the agent then stated that she owed late fees and their fees.  *Id*. ¶ 22(C) and (D).

In mid-November 2005, Montgomery telephoned Florida First and spoke to its agent.  *Id*. ¶ 25.  During this telephone call, she again was told that they had a warrant for her arrest.  *Id*.

A second telephone call to Montgomery's mother occurred on or about December 12, 2005, when Florida First's agent telephoned Montgomery's mother at approximately 7:30 a.m.  *Id*. ¶ 26.  The agent demanded to speak to Montgomery.  *Id*.  Montgomery's mother told the agent that Montgomery did not live there, as she had previously informed him.  *Id*.  The agent said to "never mind, I'm sending deputies out to arrest her right now."  *Id*.

---

[2] Montgomery was approximately 45 years old at the time of this event.  Montgomery Aff. ¶ 1.

In late December 2005, Montgomery telephoned Florida First and spoke to its agent. *Id.* ¶ 28. During that conversation, the agent called Montgomery a "liar," called her mother a "liar," and "repeatedly berate[d]" Montgomery for dishonesty because she wrote a bad check. *Id.* He again threatened to "send[] a Deputy Sheriff to pick you up on your job." *Id.*

Montgomery alleged that Florida First's actions were "willful, malicious, intentional and knowing, and in gross or reckless disregard of [her] rights . . . and were part of Florida First Financial Group's regular and routine debt collection practices." *Id.* ¶ 32. She also alleged that she retained counsel to represent her, and that she is obligated to pay her attorney a "reasonable fee." *Id.* ¶ 34.

Montgomery further alleged that because of Florida First's actions, she suffered actual damages in the form of emotional distress. *Id.* ¶ 33. As proof of her emotional distress, Montgomery averred that she could not sleep that night after her first telephone conversation with Florida First's agent, and that she continued to have problems getting enough sleep for several months. Montgomery Aff. ¶ 16. For several weeks, she woke up every hour or so, would get out of bed, and would look out of her window to see if there was a sheriff's car outside. *Id.* ¶ 26.

Montgomery averred that after her mother called her on December 12, 2005, about being arrested, Montgomery became very scared. *Id.* ¶¶ 20, 22. She spent much of her day thinking that she might be arrested and worrying that she would be unable to spend the holidays with her family. *Id.* ¶ 28. She feared humiliation from being arrested at work, and feared losing her job if she was arrested. *Id.* She feared that loss of her job would result in losing her home. *Id.* Montgomery lost her appetite for a period of two weeks. *Id.* ¶ 29.

Montgomery panicked for approximately ten minutes in January 2006 after her husband gave her the business card of a deputy sheriff he had contacted regarding damage to his car. *Id.* ¶ 31.

Montgomery thought that she was about to be arrested. *Id.* Montgomery averred generally that she suffered a number of symptoms resulting from Florida First's conduct for which she provides no specific facts. *Id.* ¶ 34.

## III.    STANDARD OF REVIEW.

A court may enter a default judgment only if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for entry of a default judgment. *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law."). Therefore, in considering a motion for default judgment, a court must examine the sufficiency of the allegations in the complaint to determine whether the plaintiff is entitled to a default judgment. *Fid. & Deposit Co. v. Williams*, 699 F. Supp. 897, 899 (N.D. Ga. 1988).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. Rather, the Court determines the amount and character of damages to be awarded." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999). If a default judgment is warranted, the court may hold a hearing for purposes of assessing damages. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (citing Federal Rule of Civil Procedure 55(b)(2)). However, a hearing is not necessary if sufficient evidence is submitted to support the request for damages. *Id.*

IV.    **ANALYSIS.**

Montgomery alleged that Florida First's actions violated 15 U.S.C. §§ 1692c(a)(1) and (b), 1692d, and 1692e(1), (2), (4), (5), (7), and (10). Doc. No. 1 at 9-11. She also alleges that Florida First violated section 559.72(7) and (10), Florida Statutes, among others. I will address these claims below.

A.    <u>False Representations</u>.

Section 1692e provides in relevant part that:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> (1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.
>
> (2) The false representation of--
> (A) the character, amount, or legal status of any debt; or
> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> . . .
>
> (4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
> . . .
>
> (7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.
> . . .

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

False or misleading representations under § 1692e are analyzed from the perspective of whether the least sophisticated consumer would be deceived or misled by the debt collector's practices. *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1175 (11th Cir. 1985).[3]

Other courts have found that threats of arrest or criminal prosecution made by a debt collector would have caused the least sophisticated consumer to believe that failure to pay the debt would result in arrest or criminal prosecution when, in fact, the debt collector did not have the power or authority to take any of those actions or make the determination that debtor was in violation of any criminal law. *See Gradisher v. Check Enforcement Unit, Inc.*, 210 F. Supp. 2d 907, 917 (W.D. Mich. 2002) (warning that "failure to make payment can result in a criminal warrant for your arrest" violated § 1692e(4) and (5)); *West v. Costen*, 558 F. Supp. 564, 579 (W.D. Va. 1983) (where debt collection agent wrote "warrant pending" on form sent to debtor, the debtor was never arrested and neither agent nor any creditor ever intended to have debtor arrested, agent had violated § 1692e(4) and (5)).  I find these cases persuasive.  Montgomery's uncontested allegation that Florida First's agent stated that they had a warrant for Montgomery's arrest and were going to send a Deputy Sheriff to arrest her establishes a violation of 15 U.S.C. § 1692e(4).

Similar to § 1692e(4), section 559.72(10) prohibits a debt collector from "us[ing] a communication which simulates in any manner legal or judicial process or which gives the appearance

---

[3] This standard does not apply to §1692e(5) regarding threats to take action that are not intended to be taken. *Jeter*, 760 F.2d at 1175. Rather, proof of lack of intent is a *per se* violation of this subsection. *Id*.

of being authorized, issued or approved by a government, governmental agency . . . when it is not." I find that Florida First's statements that they had a warrant for Montgomery's arrest and were going to arrest her establish a violation of section 559.72(10).

B.    Harassment of a Debtor.

Section 1692d prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Whether the conduct violates the statute is viewed from the perspective of a consumer whose circumstances makes her "relatively more susceptible to harassment, oppression, or abuse." *Jeter,* 760 F.2d at 1179. The statute provides nonexclusive examples of prohibited harassment, including "the use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader." 15 U.S.C. § 1692d(2); *see also Jeter,* 760 at 1175 ("[section] 1692d is explicitly not limited to the conduct proscribed by subsection (1)-(6)"). Such offensive language "might encompass name calling, racial or ethnic slurs, and other derogatory remarks which are similar in their offensiveness to obscene or profane remarks." *Jeter*, 760 F.2d at 1178. The *Jeter* court further stated "when read in context, subsection (2) was meant to deter offensive language which is at least akin to profanity or obscenity." *Id*.

In this case, Florida First's agent called Montgomery a "liar," told Montgomery that her mother also was a "liar" and "repeatedly berate[d]" Montgomery in one conversation that she was not honest because she wrote a bad check. Doc. No. 1 ¶ 28. The term "liar" falls short of language "akin to profanity or obscenity" and, therefore, does not violate the statute. *See Thomas v. LDG Fin. Servs., Inc.*, 463 F. Supp. 2d 1370, 1373 (N.D. Ga. 2006)(alleged conduct by debt collector during telephone conversation, in telling debtor that they were going to get their money one way or another, yelling that

Georgia was a garnishable state, then hanging up, and asking debtor what her problem was because she was making the same salary as she did when she was paying her bills, did not rise to the level of harassment prohibited by the FDCPA); *but see Chiverton v. Fed. Fin. Group, Inc.*, 399 F. Supp. 2d 96, 101 (D. Conn. 2005) (calling consumer a "liar" violated the FDCPA). Montgomery's § 1692d claim also fails because the complaint fails to allege facts that show that Montgomery was "relatively more susceptible to harassment, oppression, or abuse."

With respect to the repeated threats of arrest, I do not find these statements to be akin to profanity or obscenity. Although § 1692d gives the Court discretion to find other types of statements or actions to be harassing, because § 1692e(4) specifically addresses misrepresentations regarding arrest for nonpayment of a debt, to construe the same act as violative of the general provisions of § 1692d would render it superfluous. It is "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 21(2001) (internal quotations omitted). Therefore, I find that the allegations of the complaint fail to establish a violation of § 1692d.

Section 559.72(7) similarly prohibits a debt collector from "willfully engag[ing] in other conduct which can reasonably be expected to abuse or harass the debtor or any member of his or her family." Based on the statutory construction principles discussed above, I find that the threats of arrest do not establish a violation of this provision.

C.    Time and Place of Communications.

Section 1692c(a)(1) prohibits a debt collector from communicating with a consumer at any unusual time or place without the consent of the consumer or a court. "In the absence of knowledge

of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location." *Id.* For the purpose of this section, the term "consumer" includes the consumer's parent, if the consumer is a minor. 15 U.S.C. § 1692c(d). The allegation that Florida First's agent telephoned Montgomery's mother at 7:30 a.m., doc. no. 1 at 7, does not establish a violation of this section as the complaint does not plead that Montgomery is a minor and the communication was not to Montgomery herself.

   D. <u>Communications with Persons Other than the Consumer</u>.

   Section 1692c(b) generally prohibits a debt collector from communicating in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector. Although the complaint alleges that the rebate contract entered into by Montgomery was a "debt" for the purposes of the FDCPA, the complaint fails to allege that when Florida First's agent telephoned Montgomery's daughter and her mother regarding Montgomery's arrest it was because of this debt or non-payment of the debt. Therefore, the complaint fails to establish a violation of § 1692c(b) because there was no communication by Florida First to another person about Montgomery's debt. *Cf. Committe v. Dennis Reimer Co., L.P.A.*, 150 F.R.D. 495, 500 (D.Vt. 1993) (co-worker's telephone message slip stating that notice of foreclosure was being served on debtor's wife when the debtor was unmarried failed to show that communication regarding debt owed by debtor was made to third party in violation of FDCPA).

E.      Unfair Means Used to Collect a Debt.

Florida First also misstated the fees owed by Montgomery.  Section 1692f(1) provides that a debt collector may not use any unfair or unconscionable means to collect or attempt to collect any debt, such as "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  In this case, Florida First's agent told Montgomery that she owed "late fees and you[r] court costs, late fees, and our fees."  Doc. No. 1 ¶ 22(C).  When Montgomery asked how she could owe court fees when the case had not gone to court, the agent immediately retracted his claim to court costs.  *Id*. ¶¶ 22(C), 22(D).  The complaint fails to allege facts that the other fees claimed by Florida First were not owed.

Montgomery cites no case that would support a violation of § 1692f(1) based on these facts, nor has the Court located any such authority.  The misstatement of an entitlement to court costs, which is immediately retracted when the error is pointed out, does not rise to the level of unfair or unconscionable means used to collect the debt.  *See also* 15 U.S.C. § 1692k(c)(establishing an affirmative defense based on bona fide error).

## V.      DAMAGES.

### A.      FDCPA Claim.

Montgomery seeks statutory damages and actual damages pursuant to the FDCPA.  I will address each claim in turn.

#### 1.      Actual Damages.

Montgomery requests $40,000.00 in actual damages for the emotional distress she suffered as a result of Florida First's actions.  Compensation for emotional distress is considered a form of actual

damages under the FDCPA.  *See McGrady v. Nissan Motor Acceptance Corp.*, 40 F. Supp. 2d 1323, 1338 (M.D. Ala.1998).

It is established that from late October 2005 to December 12, 2005, Florida First's agent threatened Montgomery with arrest on six occasions.  The first two threats were made in telephone calls to her daughter who, in turn, informed Montgomery about the calls.  Montgomery Aff. ¶¶ 5-6. Montgomery does not aver what was her reaction to these first two calls.

The third call occurred on November 8, 2005,[4] and was made to Montgomery's mother.  After her mother placed a "frantic" call to Montgomery telling her that she would be arrested at work, Montgomery left work early.  *Id*. ¶ 7-9.  On her way to her mother's house, Montgomery looked for police officers in the neighborhood to see if she was about to be arrested.  *Id*. ¶ 10.  When Montgomery returned First Florida's telephone call that day, she was told directly that they had a signed warrant for her arrest.  *Id*. ¶ 12.  Montgomery averred that she could not sleep that night after her first telephone conversation with Florida First's agent, and that she continued to have problems getting enough sleep for several months.  *Id*. ¶ 16.  For several weeks, she woke up every hour or so, would get out of bed, and would look out of her window to see if there was a sheriff's car outside. *Id*. ¶ 26.

In mid-November 2005, Montgomery placed a call to Florida First and spoke with its agent. The agent again told her that they had a warrant for her arrest.  *Id*. ¶ 19.

---

[4] I note that Montgomery's affidavit states that the conversation occurred on November 8, 2006, but given the sequence of other events related in the affidavit, it appears that the 2006 date was a typographical error.

The sixth threat of arrest occurred on December 12, 2005, and was made in a call from Florida First's agent to Montgomery's mother. *Id*. ¶ 20. Montgomery's mother called Montgomery at work to tell her about the call. *Id*. ¶ 21. Afterwards, Montgomery became very scared about being arrested. *Id*. ¶ 22. She spent much of her day thinking that she might be arrested and worrying that she would be unable to spend the holidays with her family. *Id*. ¶ 28. She feared humiliation from being arrested at work, and feared losing her job if she was arrested. *Id*. She feared that loss of her job would result in losing her home. *Id*. Montgomery lost her appetite for a period of two weeks. *Id*. ¶ 29.

Montgomery panicked and became hysterical for approximately ten minutes in January 2006 after her husband gave her the business card of a deputy sheriff he had contacted regarding damage to his car. *Id*. ¶ 31. (Montgomery had not told her husband previously about Florida First's threats of arrest. *Id*. ¶ 32.) Montgomery thought that she was about to be arrested. *Id*.

Montgomery averred generally that she suffered a number of symptoms resulting from Florida First's conduct for which she provides no specific facts. *Id.* ¶ 34. Montgomery does not show that she sought any medical or professional services to treat her symptoms, that she took any over-the-counter medications, or that she lost any work (except for the one occasion when she left work early).

I find Montgomery's requested damages to be excessive for the relatively few number of threats of arrest made over a relatively short period of time and her reaction to those calls. Although Montgomery cites a number of jury verdicts or settlements arising from cases outside of this Circuit, the few cases reported within this Circuit establish much lower awards for the type of distress claimed by Montgomery.

For example, in *Jordan v. Collection Servs., Inc.*, Case No. 97-600-CA-01, 2001 WL 959031 (Fla. 1st Cir. Ct. April 5, 2001), a hospital's debt collectors made seven telephone calls in which they

threatened to sue the plaintiffs, to put a lien on their home, to garnish their wages, and to deny admittance to the hospital for their sick child. The court ruled that under the FDCPA, actual damages for mental anguish or emotional distress were limited to cases of extreme and outrageous conduct that had a severe impact. The jury awarded no damages. *Id*. The judgment was affirmed on appeal. *Jordan v. Collection Servs., Inc.*, 826 So. 2d 287 (2002).

Similarly, in *Thornton v. Wolpoff & Abramson*, Case No. 1:05-cv-1, 2007 WL 570254 (N.D. Ga. Jan 23, 2007), the plaintiff complained of telephone calls and letters sent to her residence attempting to collect on her ex-husband's debt, which she disputed was her responsibility and requested no further contact. The debt collector persisted. The plaintiff claimed that she suffered anger, anxiety, emotional distress, fear, humiliation and frustration. Although the jury found the debt collector liable, it awarded only $1 in statutory damages and no actual damages.

Although Montgomery suffered some temporary loss of appetite, sleeplessness and worry, I do not find that Florida First's conduct had a severe impact upon her. Accordingly, I recommend that the Court not award any actual damages.

### 2.   Statutory Damages.

The FDCPA allows additional or "statutory" damages beyond actual damages in an amount not exceeding $1,000.00. 15 U.S.C. § 1692k(a)(2)(A). Statutory damages are limited to $1,000.00 per action, not per violation. *Harper v. Better Business Servs., Inc.*, 961 F.2d 1561, 1563 (11th Cir. 1992). Factors to be considered in fixing the amount of statutory damages include "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which the noncompliance was intentional." 15 U.S.C. § 1692k(b)(1).

While the frequency of noncompliance is relatively minimal, the conduct was clearly intentional and clearly a violation of the FDCPA. In light of the evidence, I recommend that the Court award statutory damages in the amount of $500.00.

**B.     CCPA Claim.**

Montgomery seeks actual damages, statutory damages, punitive damages and injunctive relief under the CCPA. Montgomery acknowledges that she cannot recover actual damages twice for violation of both the federal law and state law. Doc. No. 56 at 3 n.1. As I have disposed of the actual damages claim above, I will address the remaining claims in turn.

1.     Statutory Damages.

Like the FDCPA, Florida's statute also contains a statutory damages provision of up to $1,000.00. Fla. Stat. § 559.77(2). Florida's statute considers the same factors as the FDCPA in determining the amount of damages. For the reasons stated above, I recommend that the Court award $500.00 in statutory damages pursuant to the CCPA.[5]

2.     Punitive Damages.

Montgomery seeks $150,000.00 in punitive damages. The Court has discretion to award punitive damages. Fla. Stat. § 559.77(2). Punitive damages may be awarded where there has been a finding of liability even if no actual damages have been proven. *Ault v. Lohr,* 538 So.2d 454, 456 (Fla. 1989).

To obtain punitive damages for violation of the CCPA, Montgomery must show that Florida First acted with malicious intent. *Tallahassee Title Co. v. Dean*, 411 So. 2d 204, 205 (Fla. 1st Dist.

---

[5] Under the previous version of section 559.77(2), $500.00 was the minimum amount that could be awarded. The present statute, amended in 2001, contains no statutory minimum.

Ct. App. 1982) *(citing Harris v. Beneficial Fin. Co. of Jacksonville*, 338 So. 2d 196, 200 (Fla. 1976)).

"Malice . . . imports a wrongful act done to inflict injury or without a reasonable cause or excuse." *Id*. at 205-06.  Montgomery's complaint alleged that Florida First's actions were "willful, malicious, intentional and knowing, and in gross or reckless disregard of the rights of Helen Montgomery. . . ." Doc. No. 1 ¶ 32.  Montgomery's complaint further alleged that Florida First's actions in this matter were part of its "regular and routine debt collection practices."   *Id*.  These allegations are deemed admitted by virtue of Florida First's default.

Montgomery recognizes that her punitive damages request is at the high end of the continuum, but argues that the amount requested is supported by Florida First's "entrenched pattern and practice" of violating the CCPA.  Doc. No. 56 at 8.  One Florida court has "suggest[ed] that one of the factors which might be considered in exercising the discretion to award punitive damages might be multiple violations of subsection 72." *Peters v. Collision Clinics Int'l Inc.,* 404 So. 2d 116, 117 (Fla. 4th Dist. Ct. App. 1981).[6]

To support her argument of an "entrenched pattern and practice," Montgomery offers numerous complaints filed with administrative agencies and the courts.   With respect to most of these complaints, Montgomery did not offer evidence that the agencies or court found Florida First liable for violation of a regulation or statute. In the absence of actual findings that Florida First violated the CCPA or the FDCPA, the numerous complaints are irrelevant and inadmissible to prove an entrenched pattern or practice of violating the law.  Fed. R. Evid. 401, 402.[7]

_____

[6] I note that no other Florida court has relied on the *Peters* decision.

[7] With respect to the complaints filed in federal court, I note that in the case of *Kiewel v. Florida First Financial Group, Inc*, United States District Court for the Middle District of Florida,

-17-

I do take judicial notice of the following:  *The Florida Bar v. Florida First Financial Group Inc.*, 695 So. 2d 275 (Fla. 1999); first amended complaint in *Gray v. Florida First Financial Group, Inc.*, United States District Court for the Middle District of Florida, Case No. 8:04-cv-308-T-24MSS (doc. no. 51), judgment (doc. No. 62), and the Notice of Acceptance of Offer of Judgment (doc. no. 60).  Fed. R. Evid. 201.

In *The Florida Bar* case, the court found that Reed Lienhart and another employee of Florida First engaged in the unauthorized practice of law by holding themselves out as attorneys in their collection efforts.  *The Florida Bar*, 695 So. 2d at 277.  The court permanently enjoined Reed Lienhart and Florida First from engaging in any activity constituting the unauthorized practice of law, including "advising others of their rights, duties, or obligations under Florida or federal law; [or] advising others of the legal consequences of their actions or inactions under Florida or federal law.  *Id*.  Engaging in any such conduct will constitute contempt of court.  *Id*. at 278.

In the *Gray* case, Florida First was alleged to have sent a letter stating that it was a crime to write a bad check and unless payment was received, the check holder may turn the matter over to the state attorney for criminal prosecution.  *Gray*, Case No. 8:04-cv-308-T-24MSS (doc. no. 51).  The plaintiff in that case accepted Florida First's offer of judgment of $1,500.00, and judgment accordingly was entered.  Although there is no precedential authority regarding whether an offer of judgment confesses liability, other circuits that have addressed the issue have found liability is confessed in the

---

Case No. 8:04-cv-183-T27, doc. nos. 22, 23, the case was dismissed due to the plaintiff's failure to appear at a status conference.  The case of *Rodriguez v. Florida First Financial Group, Inc.*, United States District Court for the Middle District of Florida, Case No. 6:06-cv-1678-28-DAB, is still pending, but it appears that Florida First is abandoning its defense just as it did in this case.  With respect to complaints made to the FTC, the FTC stated "you should know that the enclosed complaints have not necessarily been verified by the FTC."  Doc. No. 56-6 at 2.

absence of any restrictive language in the offer. *See Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 678 (9th Cir. 1997)(offer of judgment constituted an admission of liability); *Pigeaud v. McLaren*, 699 F.2d 401, 402 (7th Cir.1983) (holding that plaintiff cannot be considered a prevailing party because the offer of judgment specified that nothing therein "shall be construed as an admission of liability"). In this case, the offer of judgment contained no restrictive language. I will, therefore, consider it for purposes of this Report and Recommendation only to be a confession of liability. *Gray*, Case No. 8:04-cv-308-T-24MSS (doc. no. 60-2).

There is evidence that Florida First violated the CCPA on an earlier occasion and that Reid Lienhart was enjoined from the unauthorized practice of law with respect to his work for Florida First. This evidence is insufficient to establish an "entrenched pattern" of violating the CCPA. Therefore, while I find that punitive damages are appropriate based on Florida First's admitted malicious conduct, punitive damages at the high end of the spectrum as not warranted. Accordingly, I recommend that the Court award punitive damages in the amount of $1,000.00, which is the amount of the statutory damage award.

      3.   <u>Injunctive Relief</u>.

Montgomery also requests that the Court issue an injunction pursuant to section 559.77 that would prohibit Florida First from the following:

> (1) collecting or attempting to collect any dishonored checks; (2) collecting or attempting to collect any deferred presentment transactions including but not limited to "pay day loans" and "rebate clubs"; (3) stating or implying that defendant is part of or affiliated with law enforcement or government; (4) stating or implying that consumers committed a crime; (5) verifying account tradelines arising from "payday loans" and any other deferred presentment transactions (e.g., "rebate clubs") reported to consumer credit reporting agencies; and (6) contacting any third parties concerning consumer accounts

> (except the original creditor, defendant's attorney, and attorneys who
> represent consumers).

Doc. No. 56 at 19.  Issuance of an injunction lies within the Court's discretion.  Fla. Stat. § 559.77.

The party seeking a permanent injunction has the burden of proof.  Permanent injunctive relief may be granted only if the complaining party has shown that: (1) the act or conduct to be enjoined violates a clear legal right; (2) there is no adequate remedy at law; and (3) injunctive relief is necessary to prevent an irreparable injury.  *Eastern Fed. Corp. v. State Office Supply Co., Inc.*, 646 So.2d 737, 741 (Fla. 1st Dist. Ct. App. 1994).  Each of these elements is essential.  If the claimant fails to prove any one element, the court must deny the injunction.

Montgomery has failed to show each of the elements required for issuance of a permanent injunction.  In particular, she fails to show that the FDCPA or the CCPA do not provide an adequate remedy at law and that the injunction is necessary to prevent irreparable injury.  I, therefore, recommend that the Court decline to issue an injunction.

## VI.   ATTORNEYS' FEES AND COSTS.

Montgomery requests $62,737.50 in attorneys' fees and costs in the amount of $1,529.11.  I will address each request below.

### A.   Attorneys' Fees.

A successful plaintiff is entitled to an award of reasonable attorneys' fees under the FDCPA. 15 U.S.C. § 1692k(a)(3); *Hollis v. Roberts,* 984 F.2d 1159, 1161 (11th Cir. 1993).

In *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), the Supreme Court stated that "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." This amount, which is commonly

referred to as the lodestar, is then adjusted to reflect the "results obtained." *Id*. at 434; *accord Norman v. Hous. Auth.*, 836 F.2d 1292, 1299-302 (11th Cir. 1988).

In determining the lodestar, a reasonable hourly rate is based on the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience and reputation. *Gaines v. Dougherty County Bd. of Educ.*, 775 F.2d 1565, 1571 (11th Cir. 1985); *see also Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (enumerating additional factors to consider). Further, "it is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers. . . ." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989). Such non-legal work should be billed at a lesser rate. *Id*.

Work that is purely clerical in nature, such as contacting court reporters, and mailing, filing, and delivering documents is not compensable. *Cf. Scelta v. Delicatessen Support Servs. Inc.*, 203 F. Supp. 2d 1328, 1334 (M.D. Fla. 2002) ("[T]he efforts of a paralegal are recoverable only to the extent the paralegal performs work traditionally done by an attorney. Where that is not the case, paralegal work is viewed as falling within the category of unrecoverable overhead expenses.") (internal quotations omitted)*; Miller v. Kenworth of Dothan, Inc.*, 117 F. Supp. 2d 1247, 1261 (M.D. Ala. 2000); *see also Missouri v. Jenkins*, 491 U.S. at 288 n.10 ("Of course, purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them.").

"The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates. Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work. . . . [S]atisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits. Testimony that a given fee is reasonable is therefore

unsatisfactory evidence of market rate." *Norman*, 836 F.2d at 1299 (internal citations omitted). It is well established that the court may use its discretion and expertise to determine the appropriate hourly rate to be applied to an award of attorney's fees. *See Scelta v. Delicatessen Support Servs., Inc.*, 203 F. Supp. 2d 1328, 1331 (M.D. Fla. 2002).

The "'fee applicant bears the burden of . . . documenting the appropriate hours and hourly rates.'" *ACLU v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999) (quoting *Norman*, 836 F.2d at 1303). "[F]ee counsel should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." *Norman*, 836 F.2d at 1303. If the party submits inadequate documentation, the district court may reduce the amount of the award. *See id.*

### 4.   Reasonable Hourly Rate.

Donald E. Petersen avers that he has been licensed to practice law in Florida since 1988. Petersen Decl., ¶ 3. He further avers that he has approximately 15 years experience in federal court. His declaration provides no other information regarding his education, background, or experience.

Petersen requests his "ordinary and customary rate" of $350.00 per hour. Petersen Decl. ¶ 13. Petersen "believe(s) this rate is reasonable and reflects the current market rate in the community of my peers for federal litigation." *Id*. Petersen provides no information to support his belief. As further support, Petersen argues that this Court awarded him compensation at the rate of $350.00 per hour as a discovery sanction. Doc. No. 26. Petersen avers also that he was awarded this rate in two county court actions. Accordingly, considering the Orlando legal market and awards in similar cases, an

hourly rate of $350.00 for attorney work performed by Petersen is appropriate in the absence of objection.

In addition to his attorney work, Petersen's time sheets reflect time billed for administrative tasks. As set forth above, administrative work is not compensable. With respect to investigative tasks[8], Montgomery fails to show that $350.00 per hour is a reasonable rate for such tasks. Indeed, the investigation described easily could have been performed by a paralegal. A reasonable rate for a paralegal in the central Florida market is between $75.00 and $95.00. *Brother v. Int'l Beach Club Condo, Ass'n, Inc.*, No. 6:03-cv-444-ORL-28DAB, 2005 WL 1027240, at *6 (M.D. Fla. April 28, 2005); *Marengo v. 99 Cent Supercenter, LLC*, Case No. 6:05-cv-1792-Orl-18DAB, 2007 WL 2893388, *2 (M.D. Fla. September 05, 2006) ($95.00 per hour for paralegal time approved). Therefore, I recommend that a reasonable rate for the investigative work performed by Petersen is $95.00 per hour.

   5.   Reasonable Number of Hours.

Montgomery submitted a detailed time statement reflecting the work performed by Petersen in this case. Petersen Decl. ¶¶ 2-3. Petersen avers that he spent 153.3 hours working on Montgomery's case. *Id*. ¶ 11. Petersen further avers that he has worked 49.91 hours that equally benefitted Montgomery and the plaintiff in the *Rodriguez* case, discussed above. Therefore, he requests one-half of that time, 24.95 hours. *Id*. ¶ 12.

---

[8] *See* fn. 10 *infra*.

Petersen's time sheets reflect a number of entries for administrative tasks and investigation. I find that 4.6 hours was billed solely to Montgomery were for administrative tasks.[9]  Additionally, I find that .17 hours billed jointly to Montgomery and Rodriguez were for administrative tasks.[10]  I recommend that the Court not compensate Petersen for this administrative time, which totals 4.43. With respect to investigative work, I find that Petersen billed 3.0 hours solely to Montgomery for investigation.[11]  He also billed 16.5 hours for investigative work for Montgomery and Rodriguez, half of which he seeks to recover here.[12]  I find that the 11.25 hours $((16.5 \div 2) + 3)$ of investigative work was reasonable.

Some time entries have been redacted to such an extent that the Court cannot determine whether the time worked was reasonable.[13]  I recommend that the Court not compensate Petersen for this time, which totals .84 hours.

---

[9] See time sheets for 10/20/06 (.15); 11/1/06 (.05); 3/7/07 (.05); 3/19/07 (.85); 4/17/07 (.25); 5/25/07 (.13); 7/11/07 (.12); 1/17/08 (.75); 1/17/08 (.4); 2/1/08 (.03); 2/1/08 (.05); 2/1/08 (.10); 2/4/08 (.07); 2/4/08 (.1); 2/12/08 (.1); 2/13/08 (.08); 2/20/08 (.03); 2/21/08 (.03); 2/22/08 (.2); 2/22/08 (.4); 2/22/08 (.12); 2/22/08 (.08); 2/28/08 (.1); 3/11/08 (.05); 3/13/08 (.03); 3/31/08 (.08); 4/1/08 (.28); 4/17/08 (.02).

[10] See time sheets for 11/1/06 (.15); 11/3/06 (.02).

[11] See time sheets for 3/11/06 (1.53); 4/20/06 (.05); 3/14/07 (.1); 3/18/07 (.22); 4/17/07 (.1); 4/17/08 (1.0).

[12] See time sheets for 11/3/06 (.12); 11/3/06 (.08); 2/14/07 (.08); 2/14/07 (.27); .2/14/07 (.13); 2/21/07 (2.42); 5/26/07 (.3); 5/26/07 (.35); 5/26/07 (.07); 5/26/07 (.1); 6/7/07 (.18); 6/7/07 (.28); 7/2/07 (.08); 7/2/07 (.07); 7/2/07 (.28); 7/3/07 (.05); 1/7/08 (.72); 1/7/08 (.22); 1/8/08 (.25); 1/8/08 (.55); 1/11/08 (.13); 1/14/08 (.03); 1/16/08 (.23); 1/16/08 (.32); 1/16/08 (.03); 1/19/08 (.12); 1/19/08 (.07); 1/19/08 (.08); 1/22/08 (all entries .78); 1/23/08 (.02); 1/23/08 (.1); 1/23/08 (.07); 1/23/08 (.05); 1/23/08 (.23); 1/23/08 (.12); 1/24/08 (2.67); 1/24/08 (1.67); 2/1/08 (.13); 2/1/08 (.15); 2/17/08 (.12); 2/17/08 (all entries 2.56); 3/8/08 (.22).

[13] See time sheets for 1/22/2008 (.10 .13; .07; .08; .25); 1/23/2008 (.28).

Since the Court's entry of default on March 20, 2008, Petersen billed 25.82 hours in Montgomery's case. A review of the billing entries reflects that this time was spent preparing the instant motion for default judgment. As much of the motion was devoted to arguing for punitive damages, and a large bulk of the argument was unsupported legally, I recommend that 5 hours of time be deducted.

In all other respects, I find, in the absence of objection, that the hours worked were reasonable.

6.    Lodestar.

Based on these recommendations, the lodestar attorney's fee in this case is as follows:

| Work | Hourly Rate | Hours | Total |
|------|------------|-------|-------|
| Attorney Work in Montgomery | $350.00 | 139.86[14] | $48, 951.00 |
| Investigative Work in Montgomery | $95.00 | 3.0 | $285.00 |
| Attorney Work in Montgomery & Rodriguez | $350.00 | 16.62 (33.24[15] ÷ 2) | $5,817.00 |
| Investigative Work in Montgomery & Rodriguez | $95.00 | 8.25 (16.5 ÷ 2) | $783.75 |
| **Total:** | | | **$55, 836.75** |

I do not find that any adjustments to the lodestar are appropriate in this case.

---

[14] This figure is derived from the 153.3 hours claimed, minus 4.6 hours of administrative work, minus 3.0 hours of investigative work, minus .84 of redacted time, minus 5.0 hours excess time spent on the motion for default judgment.

[15] This figure is derived from the 49.91 hours claimed, minus .17 hours for administrative work, minus 16.5 hours for investigative work.

7.    <u>Costs</u>.

Montgomery requests $1,529.11 in costs.  Doc. No. 56 at 20.  These costs are detailed in Exhibit C to Petersen's Declaration.

Federal Rule of Civil Procedure 54(d) states that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs. . . ."  Additionally, the FDCPA allows for "costs of the action" to a successful plaintiff.  15 U.S.C. § 1692k(a)(3).   In the absence of authority suggesting otherwise, I find that Montgomery's costs are limited to those allowed by 28 U.S.C. § 1920.  *See Bernard v. Int'l Portfolio Mgmt. Inc.*, No. 04-60671-CIV-ZLOCH, 2005 WL 1840157, *4 (S.D. Fla. July 25, 2005) (limiting costs under the FDCPA to those listed in § 1920); *Casden v. JBC Legal Group*, Case No. 04-60669-CIV-Marra, 2005 WL 165383, *1 (S.D. Fla. Jan. 7, 2005)(limiting costs recoverable under the FDCPA to those listed in § 1920 absent authority suggesting otherwise); *Mann v. Acclaim Fin. Servs., Inc.*, 348 F. Supp. 2d 923, 931 (S.D. Ohio 2004) (noting that costs recoverable under the FDCPA are limited to those listed in § 1920 ).

I recommend that Montgomery recover the following costs pursuant to § 1920: $350.00 for filing fees; $27.00 for service of process;[16] $530.00 for the deposition of Reed Lienhart, and $271.07 for photocopies.  These costs total $1,178.07.

With respect to the $250.00 fee charged by Palm Services for service of process on witness Keith White, Montgomery fails to provide sufficient information to determine whether the fee is in an amount that would be authorized for service by the marshal.  Accordingly, I recommend that the Court award $45.00 for service of process on White, which is the minimum fee for service of process by the Marshals Service.

The $16.25 express mail fee is not recoverable.  *Scelta v. Delicatessen Support Servs., Inc.*, 203 F. Supp. 2d 1328, 1339 (M.D. Fla. 2002)

Petersen also requests $84.79 ($169.58 ÷ 2) for mileage expenses.  Such costs are not compensable pursuant to § 1920.  *Scelta,* 203 F. Supp. 2d at 1339 ( attorney travel and lodging, and attorney meals are not compensable).

---

[16] Private process server fees may be taxed pursuant to § 1920 to the extent that they do not exceed the statutory fees authorized for service by the marshal pursuant to 28 U.S.C. § 1921. *E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000).  Fees of the United States Marshals listed in 28 U.S.C. § 1921(a), include, among other things: 1.) fees for service of process (28 U.S.C. § 1921(a)(1)(A)); 2.) fees for serving a subpoena or summons for a witness (28 U.S.C. § 1921(a)(1)(B)); 3.) fees for "necessary travel" for service of process (28 U.S.C. § 1921(a)(1) (G)); and, 4.) fees for overtime expenses incurred while serving process (28 U.S.C. § 1921(a)(1)(H)).  Section 1921 also states that the "Attorney General shall from time to time prescribe by regulation the fees to be taxed and collected under [§ 1921(a) ]."  28 U.S.C. § 1921(b).  The Attorney General prescribes a minimum fee of $45.00 per hour for "process served or executed personally . . . for each item served by one U.S. Marshals Service employee, agent, or contractor, plus travel costs and any other out of pocket expenses." 28 C.F.R. § 0.114(a) (3).  An additional fee of $45.00 per hour plus costs and expenses is charged for each additional U.S. Marshals Service employee, agent, or contractor "who is needed to serve process. . . ." *Id.*

In sum, I recommend that the Court award $1,223.07 in costs.

**VII.   RECOMMENDATION.**

For the foregoing reasons, I recommend that Plaintiff's Motion for Judgment Upon Default, doc. no. 55, be **GRANTED in part and DENIED in part**.  I recommend as follows:

1.      The Court enter a default judgment against Florida First Financial Group, Inc. to pay Montgomery damages in the amount of $2,000.00 for actual, statutory and punitive damages, $55, 836.75 in attorney's fees, and $1,223.07 in costs.

2.      The Court direct the Clerk to issue a judgment consistent with its ruling on this Amended Report and Recommendation and, thereafter, to close the file.

3.      The Court notify the Florida Bar and the Florida Supreme Court of potential violation of the Florida Supreme Court's injunction as set forth in *The Florida Bar v. Florida First Financial Group Inc.*, 695 So. 2d 275 (Fla. 1999), as evidenced by the instant motion.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 21, 2008.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy